IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| John Helriegel | : | |
| | : | |
| v. | : | No. 346 C.D. 2022 |
| | : | |
| Commonwealth of Pennsylvania, | : | |
| Department of Transportation, | : | |
| Bureau of Driver Licensing, | : | |
| Appellant | : | Submitted: December 12, 2022 |

BEFORE:    HONORABLE CHRISTINE FIZZANO CANNON, Judge
           HONORABLE ELLEN CEISLER, Judge
           HONORABLE STACY WALLACE, Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION
BY JUDGE CEISLER                                      FILED: January 10, 2023

The Department of Transportation, Bureau of Driver Licensing (DOT), appeals from the March 14, 2022 Order of the Court of Common Pleas of Lehigh County (Trial Court), which sustained the appeal of John Helriegel (Licensee) from the 18-month suspension of his operating privilege imposed by DOT under Section 1547(b)(1)(ii) of the statute commonly known as the Implied Consent Law, 75 Pa. C.S. § 1547(b)(1)(ii),[1] for his refusal to submit to chemical testing following his

---

[1] Section 1547(b)(1)(ii)(B)(III) of the Implied Consent Law provides in pertinent part:

(1)  If any person placed under arrest for a violation of [S]ection 3802 [of the Vehicle Code, 75 Pa. C.S. § 3802 (relating to driving under the influence of alcohol or a controlled substance),] is requested to submit to chemical testing and refuses to do so, the testing shall not be conducted but upon notice by the police officer, [DOT] shall suspend the operating privilege of the person as follows:

. . . .

(ii)  For a period of 18 months if any of the following apply:
**(Footnote continued on next page…)**

arrest for driving under the influence (DUI). For the reasons that follow, we reverse the Trial Court's Order and direct DOT to reinstate the 18-month suspension of Licensee's operating privilege.

## Background

On July 8, 2021, DOT notified Licensee that his operating privilege was suspended for 18 months, effective August 12, 2021, for his failure to submit to chemical testing on June 26, 2021. Licensee filed a statutory appeal with the Trial Court, which held a *de novo* hearing on March 14, 2022.

At the hearing, Trooper Matthew Haber testified that he had been a trooper with the Pennsylvania State Police (PSP) for three years and was trained in recognizing DUIs and performing field sobriety tests. N.T., 3/14/22, at 6. Trooper Haber testified that he was assigned to rove in the vicinity of a DUI checkpoint on the evening of June 25, 2021. *Id.* at 6-7. Around midnight the next morning, while standing outside of his patrol vehicle, Trooper Haber observed the driver of a red Mazda commit a traffic violation. *Id.* at 7. Trooper Haber effectuated a traffic stop and discovered that Licensee was the driver of the Mazda. *Id.* Trooper Haber testified that he detected an odor of alcohol emanating from the vehicle. *Id.* He also testified that Licensee avoided making eye contact with him while he was trying to

---

. . . .

> (B) The person has, prior to the refusal under this paragraph, been sentenced for[] . . . (III) an offense equivalent to an offense under [Section 3802] . . . .

75 Pa. C.S. § 1547(b)(1)(ii)(B)(III). Licensee's certified driving record shows that he was previously convicted of violating Arizona's DUI statute in 2011. *See* Notes of Testimony (N.T.), 3/14/22, Ex. C-1.

observe whether Licensee's eyes were glassy. *Id.* Trooper Haber asked Licensee to exit the vehicle. *Id.*

Trooper Haber testified that after Licensee exited his vehicle, Licensee used both his own vehicle and the trooper's patrol vehicle to stabilize himself. *Id.* at 7-8. Trooper Haber also observed that Licensee's speech was slurred and smelled an odor of alcohol emanating from Licensee's person. *Id.* at 8.[2] Trooper Haber then administered the horizontal gaze nystagmus test, the walk-and-turn test, and the one-leg-stand test, during which Licensee displayed numerous indicators of impairment. *Id.* Licensee refused Trooper Haber's request for a preliminary breath test at the scene. *Id.*

Trooper Haber arrested Licensee for suspicion of DUI and transported him to the Lehigh County Central Booking Center (CBC) for processing. *Id.* at 9. Trooper Haber read the implied consent warnings for a blood test from the Lehigh County CBC implied consent form to Licensee. *Id.* at 9-10. Trooper Haber then asked Licensee to submit to a blood test, which Licensee refused. *Id.* at 11. Both Trooper Haber and Licensee signed the implied consent form. *Id.* Trooper Haber testified:

> **Q** And it states just above that signature . . . : With these warnings in mind, will you submit to a chemical test for alcohol and/or controlled substance? It's checked no. Did [Licensee] check that or did you?
>
> **A** I believe [Licensee] checked it.
>
> **Q** In your presence?
>
> **A** Yes.

---

[2] Trooper Haber mistakenly testified that he "detected an odor of marijuana" during the traffic stop, but he later corrected his testimony and clarified that he smelled alcohol. N.T., 3/14/22, at 8, 14-15.

**Q** Did you deem that to be a refusal?

**A** Yes.

*Id.* at 11-12; *see id.*, Ex. C-2.

Trooper Haber testified that he then read the implied consent warnings from DOT's DL-26A Form[3] to Licensee and asked him to submit to a breath test. N.T., 3/14/22, at 12-13 & Ex. C-1. Trooper Haber explained what transpired next:

> Originally [Licensee] said no. So at that point, the CBC personnel were starting to process him and . . . I believe he changed his mind and said he would provide a breath test.
>
> . . . .
>
> . . . The CBC at that time informed me that they did not have an Intoxilyzer or breath test operational at that time due to COVID reasons.
>
> . . . .
>
> . . . I was advised to see if any state police barracks or stations had any, [so] I called PSP Belfast because I knew that they had one. And . . . I was informed that they also did not have a test operator to run the Intoxilyzer at Belfast.
>
> So, at that point, I contacted an A[ssistant District Attorney] from the Lehigh County District Attorney's Office, . . . [and] I advised him of the situation. [H]e advised me that it was to be treated as a refusal since there w[ere] no other opportunities for a breath test.

*Id.* at 13-14.

---

[3] DOT's "DL-26 Form[s] contain[] the chemical test warnings required by Section 1547 of the Vehicle Code, which are also known as the implied consent warnings." *Vora v. Dep't of Transp., Bureau of Driver Licensing*, 79 A.3d 743, 745 n.2 (Pa. Cmwlth. 2013). The DL-26A Form is used to provide warnings and obtain consent when law enforcement requests a breath test; the DL-26B Form is used when law enforcement requests a blood test.

4

On cross-examination, Trooper Haber testified that when Licensee agreed to take a breath test, Trooper Haber "agreed that [he] would at least look into options to facilitate that," so he "attempted to see if there w[ere] any options, which there w[ere]n't." *Id.* at 15-16. At that point, Trooper Haber did not re-read any forms to Licensee "[b]ecause there was no other test to take place." *Id.* at 16.

Trooper Haber then testified that, after he was unable to locate an available breath test, he offered Licensee another opportunity to take a blood test, which Licensee again refused. Trooper Haber testified:

> **Q** . . . And at that point in time, did you go back and tell [Licensee] that his election to take a breath test would now be a refusal because he wouldn't give the blood test? Did you give him another opportunity to give the blood test?
>
> **A** Yeah. I told him that there is no breath test at the CBC and I could not provide him a breath test. I let him know that. He was advised.
>
> **Q** . . . *Did you give [Licensee] the opportunity then to consent to the blood test?*
>
> **A** *He still refused blood.*
>
> . . . .
>
> *. . . [Licensee] was advised there was no breath test available, and the only other option was blood, which he still did not . . . consent to.*

*Id.* at 16-17 (emphasis added).

Licensee testified that he was "a manager of investment performance reporting at SEI Investments in Oaks, Pennsylvania." *Id.* at 20. Licensee testified regarding the events of June 26, 2021, as follows:

> **A** So [Trooper Haber] brought me in. He read a form . . . and asked me, and I had initially refused. I was put into the holding cell for a little

5

while.  He brought me back out.  Asked me again.  *At that point, I did say that I would consent to a [b]reathalyzer. . . .* He took me out of the small room into, I guess, whatever the bullpen area was.  He borrowed a [b]reathalyzer kit from another officer, started giving it to me in the bullpen.  I did about two breaths.  The officer was then stopped by some other person – it was a woman.  And then I was put back into holding.  They said that they were going to take me to Belfast to do a . . . they had the equipment there.

**Q** . . . When he started to give you that breath test in the station, was that a handheld breath machine, like a preliminary breath test?

**A** Yes.  It was a handheld one.

**Q** And did you overhear any conversation . . . between the two people . . . when he asked you to give that breath test?

**A** Yeah. . . . I heard a little bit, something about admissibility.  They were a little far away, but I did get that part.

. . . .

**Q** What was your understanding at that point as far as what your obligation was?

**A** *My understanding was that I consented to a breath test, and that I was going to have the opportunity to do it and that was going to have to take place in Belfast.*

**Q** *And did that take place?*

**A** *No. . . . I got put back into the cell after a while, and they came back and they said that Belfast was closed.  Or . . . [n]obody was at Belfast.*

*Id.* at 21-22 (emphasis added).

Licensee testified that he did not recall being told at that time that he would lose his license if he did not consent to a blood test.  *Id.* at 23.  He further testified

that he did not know that it was not his choice as to whether to give breath or blood, and he "did not get the impression that there was no choice." *Id.* Licensee testified:

> **Q** . . . *[A]fter they found out that they didn't have a place to give you a breath test, did anyone restate to you or state to you after that that you would be losing your license?*
>
> **A** *Not that I recall.* [Trooper Haber] put me back into a room and had me do, like, the standing on one leg and walk on a line.

*Id.* at 24 (emphasis added). Licensee then reiterated that it was his understanding that he "had a choice to do the breath [test] and consented." *Id.* at 24-25.

On cross-examination, Licensee testified that the Lehigh County implied consent form was read to him, he had the opportunity to read the form, he signed the form, and he refused to give his blood. *Id.* at 25-26.

At the conclusion of the hearing, after closing arguments from counsel, the Trial Court stated on the record:

> I'm truly bothered by . . . offering a test and then it not being able to be performed. That's why I asked the question about COVID. I didn't understand . . . if it was something that was completely COVID-related, I certainly would not hold that against [Licensee]. But I am very much bothered by this fact that we're offering these tests that we then can't perform. Perhaps in the future, it would be better to find out if breath is an option before it's offered to the arrestee at that point.
>
> *So I do believe that this caused this confusion, and it was not a willing and voluntary refusal ultimately*. . . . So I am constrained . . . in this case to sustain the appeal.

*Id.* at 31-32 (emphasis added).

Following the hearing, the Trial Court entered an Order sustaining Licensee's appeal. In its subsequent Pa.R.A.P. 1925(a) Statement, the Trial Court further explained its reasoning as follows:

7

[T]he [Trial C]ourt noted concern over the fact that [Licensee] had been offered a breath test that the trooper later learned could not be administered due to COVID reasons. The better course of conduct would have been to have discerned from CBC if they had the ability to administer the breath test before that option was offered to [Licensee]. Once it was offered, at no time was there testimony that the lapse in time, conduct of [Licensee], or the changed mind of the trooper was the reason why the breath test was not administered. It would have been considered an impermissible burden to assume that [Licensee] would have been able to take a test that the trooper was not even able to locate. [Licensee] was and remained willing to take the breath test. *This court concludes that there was no refusal of a breath test. It was [Licensee's] belief that he still had the option of a breath test even when asked again about the blood test. Since there had never been a revocation of the offer to take the breath test, reliance on a subsequent request for the blood test would be inappropriate. [Licensee] was justified in believing that the breath test was still a viable option for him. Since the breath test had not been revoked by the trooper, any second request for blood testing should not have been brought up by the trooper.*

Trial Ct. 1925(a) Stmt., 5/16/22, at 5-6 (emphasis added). DOT now appeals from that decision.[4]

## Analysis

The sole issue before this Court is whether Licensee refused Trooper Haber's request for chemical testing under the Implied Consent Law. Specifically, we must decide whether Licensee's subsequent willingness to submit to a breath test, which Trooper Haber learned was unavailable and informed Licensee was unavailable, waived Licensee's earlier refusal to submit to a blood test.

---

[4] This Court's review is limited to determining whether the Trial Court committed an error of law or abused its discretion or whether the Trial Court's factual findings are supported by substantial evidence. *Garlick v. Dep't of Transp., Bureau of Driver Licensing*, 176 A.3d 1030, 1035 n.6 (Pa. Cmwlth. 2018) (*en banc*).

8

To sustain a suspension of a licensee's operating privilege under the Implied Consent Law, DOT must establish that the licensee: (1) was arrested for DUI by a police officer with reasonable grounds to believe that the licensee was operating a vehicle while under the influence of alcohol or a controlled substance; (2) was asked to submit to chemical testing; (3) refused to submit to chemical testing; and (4) was warned by the officer that his license would be suspended if he refused to submit to chemical testing. *Boseman v. Dep't of Transp., Bureau of Driver Licensing*, 157 A.3d 10, 14 (Pa. Cmwlth. 2017). The only element at issue in this case is whether DOT met its burden of proving that Licensee refused to submit to chemical testing.

Whether a licensee has refused a request for chemical testing is a question of law based upon the facts found by the trial court. *Gregro v. Dep't of Transp., Bureau of Driver Licensing*, 987 A.2d 1264, 1267 (Pa. Cmwlth. 2010). What constitutes a refusal under the Implied Consent Law is not defined in the statute itself. However, our appellate courts have held that "anything less than an unqualified, unequivocal assent constitutes a refusal under [Section] 1547." *Dep't of Transp. v. Renwick*, 669 A.2d 934, 939 (Pa. 1996); *see also Factor v. Dep't of Transp., Bureau of Driver Licensing*, 199 A.3d 492, 497 (Pa. Cmwlth. 2018) ("Pennsylvania courts have long and consistently held that anything less than an unqualified, unequivocal assent to submit to chemical testing constitutes a refusal to consent thereto.").

On appeal, DOT asserts that the Trial Court erroneously concluded that Licensee's prior refusal to submit to a blood test was vitiated by his subsequent consent to a breath test, despite the unavailability of a breath test. In response, Licensee asserts that once he consented to a breath test and Trooper Haber agreed to provide a breath test, his "initial refusal became irrelevant, as if it had not occurred." Licensee's Br. at 5. We disagree with Licensee.

9

In *Olbrish v. Department of Transportation, Bureau of Driver Licensing*, 619 A.2d 397, 398 (Pa. Cmwlth. 1992), the licensee failed to produce an adequate breath sample, which was deemed a refusal. The officer then offered the licensee an opportunity to take a blood test, which he agreed to. *Id.* After being transported to the hospital, however, the licensee refused to sign a hospital waiver, so the hospital would not draw his blood. *Id.* On appeal, the licensee argued that the officer's offer to administer the blood test at the hospital constituted a waiver of his initial refusal. *Id.* This Court disagreed and concluded that no waiver of the first refusal occurred, because the officer's subsequent offer was "at most gratuitous and could be revoked at any time before the test was administered." *Id.* at 398. We further stated that "[w]here there is a refusal and the police then gratuitously offer a second test *which the licensee successfully completes*, a waiver of the first refusal may occur." *Id.* at 398 n.3 (emphasis in original); *see also Geonnotti v. Dep't of Transp., Bureau of Driver Licensing*, 588 A.2d 1343, 1346 & n.7 (Pa. Cmwlth. 1991) (holding that the licensee's acceptance of an officer's third offer for a breath test, which was ultimately not performed due to the passage of time, did not waive the licensee's prior refusals, because "[n]o obligation or property right existed requiring the administration of a second test" and the licensee never completed any test). Thus, *Olbrish* and *Geonnotti* instruct that once a licensee refuses a requested chemical test, even if the officer gratuitously offers a second test, the first refusal is not waived unless the licensee subsequently completes a chemical test.

Here, like the licensees in *Olbrish* and *Geonnotti*, Licensee never completed any chemical test. Trooper Haber initially asked Licensee to submit to a blood test and read the blood test warnings from the Lehigh County implied consent form to Licensee, but Licensee refused. Trooper Haber then read the breath test warnings

10

from DOT's DL-26A Form to Licensee and asked him to submit to a breath test. Licensee "[o]riginally . . . said no," but he then "changed his mind and said he would provide a breath test." N.T., 3/14/22, at 13. Licensee testified that once he agreed to take a breath test, he "did about two breaths" into a handheld breathalyzer device, but the officer stopped the test and told Licensee he would need to take a breath test at PSP Belfast. *Id.* at 21-22.[5] Trooper Haber attempted to locate an operational Intoxilyzer device for a breath test at the CBC but was unsuccessful. Trooper Haber also contacted PSP Belfast, but he was advised that the Belfast station did not have an operator to conduct a breath test. *Id.* at 13.

Importantly, Trooper Haber testified that, upon learning that there was no available breath test, he notified Licensee "that there [was] no breath test at the CBC and [he] could not provide him a breath test." *Id.* Licensee also testified that he was advised that he could not perform a breath test because "they came back and they said that Belfast was closed. Or . . . [n]obody was at Belfast." *Id.* at 22. Trooper Haber further testified that he advised Licensee "that there was no breath test available, and the only other option was blood, which he still did not . . . consent to." *Id.* at 17. Trooper Haber clarified that, at that time, Licensee "still refused blood." *Id.* at 16. Under these circumstances, we conclude that no waiver of the first refusal occurred because, even though Licensee subsequently consented to a breath test, he did not complete any chemical test. *See Jackson v. Dep't of Transp., Bureau of Driver Licensing*, 191 A.3d 931, 937 (Pa. Cmwlth. 2018) (*en banc*) ("In this case, *no waiver* of the first refusal occurred, because *Licensee did not successfully*

---

[5] According to DOT, any result from a handheld, pre-arrest breathalyzer device "would not have been admissible in a criminal proceeding for DUI" and "would not have satisfied [Licensee's] obligation to complete a chemical test in accordance with" the Implied Consent Law. DOT's Br. at 20.

11

*complete any testing*.") (emphasis added); *see also Dep't of Transp. v. Gross*, 605 A.2d 433, 436 (Pa. Cmwlth. 1991) ("We have held on numerous occasions that once a motorist refuses a chemical test under [the Implied Consent Law], [DOT] may properly suspend the motorist's operat[ing privilege] *regardless of whether or not the motorist subsequently assents to a chemical test*.") (emphasis added).

In sustaining Licensee's appeal, the Trial Court determined that Licensee reasonably believed that he had fulfilled his obligation under the Implied Consent Law by agreeing to submit to a breath test, even though the test was later determined to be unavailable. The Trial Court found:

> It was [Licensee's] belief that he still had the option of a breath test even when asked again about the blood test. *Since there had never been a revocation of the offer to take the breath test, reliance on a subsequent request for the blood test would be inappropriate. [Licensee] was justified in believing that the breath test was still a viable option for him.* Since the breath test had not been revoked by the trooper, any second request for blood testing should not have been brought up by the trooper.

Trial Ct. 1925(a) Stmt., 5/16/22, at 6 (emphasis added); *see Geonnotti*, 588 A.2d at 1346 (recognizing that an officer's offer of a second chemical test "is a matter of grace and can be revoked at any time up until the test is administered").[6]

---

[6] In reaching its decision in this case, the Trial Court relied on *Lutz v. Department of Transportation, Bureau of Driver Licensing*, 734 A.2d 478 (Pa. Cmwlth. 1999), and *Burke v. Department of Transportation, Bureau of Driver Licensing*, 733 A.2d 13 (Pa. Cmwlth. 1999). In *Lutz*, this Court held that the licensee's failure to sign a hospital form agreeing to assume financial responsibility for the blood test, which was an "impermissible burden," did not vitiate his consent to the test. 734 A.2d at 481. In *Burke*, this Court held that the licensee's refusal to sign a hospital consent form while continuing to assert his assent to a blood test did not constitute a refusal, because "although the hospital attached an impermissible precondition to the blood test by requiring [the l]icensee to sign a form, the officers at no time revoked the subsequent offer of a blood test." 733 A.2d at 18. We conclude, however, that *Lutz* and *Burke* are inapposite here. In each of those cases, the hospital administering the blood test created an "impermissible burden"
**(Footnote continued on next page…)**

We find *Karabinos v. Department of Transportation, Bureau of Driver Licensing*, 739 A.2d 601 (Pa. Cmwlth. 1999), instructive here. In *Karabinos*, this Court explained what is required when an officer requests a subsequent chemical test after receiving the licensee's consent to an initial test, as follows:

> The question . . . remains[] . . . whether an officer is obligated to inform a licensee why a second test is requested in order to dispel the licensee's possible, and reasonable, subjective belief that he fulfilled his obligation under the Implied Consent Law by complying with an initial chemical test.
>
> *We hold today that the licensee must be so informed because a licensee, knowing that a police officer may only request one test if it is a valid test, may well believe that he has adhered to the law's requirements and that he has a right to refuse a second request. Only if the licensee is informed why a second test is requested, is he prepared to make that vital decision to comply with the test or to refuse.* Because a licensee may lawfully refuse a request for a second test, unless the licensee is informed of the reason why that right is no longer valid, he has not been provided an opportunity to give his informed consent to the request.

*Id.* at 604 (emphasis added); *see also Ryan v. Dep't of Transp., Bureau of Driver Licensing*, 823 A.2d 1101, 1104 (Pa. Cmwlth. 2003) ("Where repetition of [a post-arrest chemical] test is requested, *the licensee must be informed why it is requested.*") (emphasis added); *accord Perry v. Dep't of Transp., Bureau of Driver Licensing* (Pa. Cmwlth., No. 1441 C.D. 2014, filed Apr. 1, 2015), slip op. at 5-6 (holding that the licensee's subsequent failure to consent to a blood test was deemed a refusal under the Implied Consent Law, where the licensee initially consented to a breath test but was advised that the breathalyzer machine was down and the officer would be unable

---

by imposing a precondition to the licensee's completion of the test to which he had consented, a fact not present in this case.

to administer a breath test, and the licensee never provided any post-arrest breath sample).[7]

We conclude that the Trial Court's finding that Trooper Haber's offer of a breath test was never revoked is unsupported by the evidence of record.[8]  As explained above, both Trooper Haber *and* Licensee testified that Licensee was informed that a breath test could not be performed because there was no Intoxilyzer device at the CBC and there was no available breath test operator at PSP Belfast. N.T., 3/14/22, at 13, 16-17, 22.  This testimony directly conflicts with the Trial Court's finding that Licensee "was justified in believing that the breath test was still a viable option for him."  Trial Ct. 1925(a) Stmt., 5/16/22, at 6.  While Trooper Haber did not use the term "revoke" in speaking with Licensee about the breath test, the record establishes that Trooper Haber clearly advised Licensee that he could not provide a breath test because a breath test was unavailable before making the subsequent request for a blood test, which Licensee refused.  *See id.* at 16-17, 26. Under our case law, because Trooper Haber informed Licensee of the reason *why* he was requesting a blood test after Licensee had consented to a breath test, we conclude that Trooper Haber satisfied the requirements of the Implied Consent Law.

We also conclude, contrary to Licensee's contention, that Trooper Haber was not required to re-read the implied consent warnings when he made the second request for a blood test, after advising Licensee that a breath test was unavailable. In *Trobovic v. Department of Transportation, Bureau of Driver Licensing*, 553 A.2d

---

[7] We may cite an unreported memorandum opinion as persuasive authority pursuant to this Court's Internal Operating Procedures.  *See* 210 Pa. Code § 69.414(a).

[8] This Court on appellate review may not make new or different findings of fact; we may only review the Trial Court's findings to determine if they are supported by substantial, competent evidence.  *Boseman*, 157 A.3d at 18.

14

531, 533 (Pa. Cmwlth. 1989) (emphasis in original), this Court explicitly rejected the licensee's argument that "*each time* a request is made to submit to chemical testing the police officer must warn the licensee of the consequences of a refusal." We explained:

> Section 1547(b)[] of the [Implied Consent Law] provides that a police officer must inform licensees of the consequences of refusal upon requesting that they submit to chemical testing. As the trial court found, [the arresting officer] provided [the licensee] with an appropriate warning after initially asking that he submit to a blood test. *There is no requirement that the warning be given if the officer again asks the licensee to submit to chemical testing and we refuse to read any such requirement into the [Implied Consent Law]. The arresting officer may, in his discretion, provide a licensee who has refused chemical testing with a subsequent opportunity to assent. However, he is not then required to provide another warning of the consequences of refusal.*

*Id.* (emphasis added); *see also Boseman*, 157 A.3d at 15 ("Once a police officer provides the implied consent warnings to a motorist, the officer has done all that is legally required to ensure the motorist is fully advised of the consequences of failure to submit to chemical testing.").[9] In this case, the record establishes that Licensee

---

[9] At the hearing, Licensee testified that he believed he had the right to choose which chemical test would be performed. N.T., 3/14/22, at 23-25. However, our Supreme Court has held that it is the police officer, not the licensee, who chooses which chemical test to administer:

> Reading Section 1547(b)(1) to reflect an intent to provide motorists with the right to choose their preferred chemical test would fail to give effect to the mandate of universal implied consent provided in Section 1547(a). Indeed, it would be incongruous to establish a system that deems a motorist to have implicitly consented to take any test or tests that may be requested of him during a DUI arrest but then gives him the right to decline any official request for a test or tests as long as his preferred test is reasonably practicable. *By implicitly consenting to any and all chemical tests in Section 1547(a), a motorist arrested for DUI is subject to any*

**(Footnote continued on next page…)**

15

received the requisite warnings for both the breath and blood tests when those tests were initially requested. N.T., 3/14/22, at 11-13, 25-26 & Exs. C-1 and C-2. Therefore, Trooper Haber was not required to re-read the implied consent warnings to Licensee when he made the second request for a blood test.

## Conclusion

In sum, we conclude that DOT satisfied its burden of proving that Licensee refused chemical testing under the Implied Consent Law. Trooper Haber provided Licensee with the appropriate implied consent warnings before requesting that he submit to chemical testing – i.e., that Licensee's operating privilege would be suspended if he refused to consent to chemical testing. Trooper Haber also properly informed Licensee why he was unable to administer a breath test after Licensee had consented to a breath test. Upon learning that the breath test was unavailable, Licensee refused Trooper Haber's second request for a blood test and ultimately completed no chemical test. Under these circumstances, we conclude that Licensee's subsequent willingness to submit to a breath test did not waive his initial refusal to submit to a blood test.

Accordingly, we reverse the Trial Court's Order and direct DOT to reinstate the 18-month suspension of Licensee's operating privilege.

_____
ELLEN CEISLER, Judge

---

*and all tests, and he effectively relinquishes any right to choose his preferred test over an officer's.*

*Nardone v. Dep't of Transp., Bureau of Driver Licensing*, 130 A.3d 738, 745 (Pa. 2015) (emphasis added).

16

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

John Helriegel                 :
                               :
       v.                 :   No. 346 C.D. 2022
                                 :
Commonwealth of Pennsylvania,   :
Department of Transportation,     :
Bureau of Driver Licensing,       :
                 Appellant    :

# **O R D E R**

AND NOW, this 10th day of January, 2023, the March 14, 2022 Order of the Court of Common Pleas of Lehigh County is hereby REVERSED, and the Department of Transportation, Bureau of Driver Licensing, is hereby directed to REINSTATE the 18-month suspension of John Helriegel's operating privilege.

 

_____
ELLEN CEISLER, Judge